Our next case today is number 23-3467, Pasha Thomas v. City Schools of Decatur. Thank you. Good morning, Your Honors, and may it please the Court, this is Mary McAllister. I represent the plaintiff and appellant, Pasha Thomas. When Mrs. Thomas reported that her five-year-old little girl was sexually assaulted by a boy in the girl's restroom, she was publicly spurned as a liar by the school district. When she sought justice from the Court, she had the door slammed in her face. The Court forbid her from obtaining evidence or even discussing the district protocol that permitted the male classmate to enter the girl's restroom and then punished Mrs. Thomas for not providing enough evidence to survive summary judgment. Even with the Court's impermissible restriction on discovery, Mrs. Thomas provided evidence that raised a number of tribal issues of material fact, including an OCR investigation that determined that there was a violation of Title IX, questions regarding whether the school district did any investigation, which the OCR report said they did not, and an expert witness opinion saying that the de facto report that was filed against Mrs. Thomas was done in bad faith. So there were a series of errors by the district court that deprived the plaintiff of justice. First— I can't agree with your de novo review as to whether your client is entitled to a summary judgment based on the record that's before us. Am I wrong about that? That is the main decision, but behind those decisions, there were earlier decisions. There was the improper dismissal of part of the Title IX claim, and then the improper curtailment of discovery that then affected the ability to properly respond to the summary judgment. And you mentioned the OCR investigation concluding that the school district violated—you said violated Title IX. Yes. It's a very specific finding of OCR that the school district violated Title IX's implementing regulations by failing to provide a prompt and equitable response. I just want to—like, you would agree that that's—you just said they confirmed a Title IX violation, but I want to hone in on the specifics of what that OCR finding was, correct? Correct. The OCR found that the district violated Title IX, although the district immediately started to respond to the report, they then took no further steps after that initial response. But the Title IX violation was an implementing regulation dealing with promptly providing a response to Thomas, right? Correct. Correct. So the initial error that put this in motion, that led to this summary judgment motion being wrongly decided against Ms. Thomas, was that the court divided up the Title IX claim and said, okay, there's a Title IX claim dealing with the pre-assault knowledge, post-assault knowledge, and they also talked about supervision of the perpetrator. But they—the court then dismissed improperly the prior assaults in saying that we had not met the Rule 12b-6 standard, but in fact we had met the 12b-6 standard and the court exceeded the scope of its review under Rule 12b-6 on that issue in that it ignored properly pled allegations, it offered—expressed its own disbelief at the validity of the allegations. We're not up here to grade the district court on a score sheet. You need to tell us why you're pleading satisfied with the requirements and should not merit a 12b-6 dismissal. Yes, Your Honor. We had the allegations in our First Amendment complaint, which was the complaint in which the portion of Title IX was dismissed. We stated all of the necessary prerequisites. We stated that they had initiated this policy that permitted intermingling of the sexes in the restroom, that they had been warned that this might cause trouble, that they continued to institute it anyway. And that they didn't provide any safeguards. They did not provide any safeguards, correct. And they had—we laid out in very great detail, in fact, Allegation 152, which the district court dismissed as not pertinent, we laid out very specifically the things that the district court did— excuse me, the things that the district did, secretly adopting a policy that fundamentally changed the privacy and safety of the educational environment. Okay, so in our Adams v. DeMopolis City Schools case, 2023 case, we say—  Hold a Title IX funding recipient accountable for student-on-student sex harassment. A plaintiff must establish that the public school was deliberately indifferent to sexual harassment, of which it has actual knowledge that is so severe, pervasive, and objectively offensive that it can be said to deprive the victim of access to the educational opportunities or benefits provided by the school. And so here, you have noted that parents have raised concerns about the policy, but that's not— there are no allegations like, oh, assaults have occurred, you're not complaining. What is the knowledge that the school district has of this severe, pervasive, and objectively offensive situation? Well, they knew that they were putting together a policy that permitted the intermingling of the sexes in the restroom. But how does that meet the test that I just laid out? Well, it meets it because that would— the district would know that that kind of an action would lead to misconduct. It might lead. That's not what this standard says. It says actual knowledge, deliberately indifferent to sexual harassment, of which it has actual knowledge that is severe, pervasive, and objectively offensive. That's what the standard is that you have to meet in pleading this. Where is—how do you meet that? By saying we were—the parents were afraid a problem might arise. How does that rise to this level? Well, and that, of course, that's not the entire— I mean, obviously, the other half of the Title IX case is the post-report actions by the school. Right, and we're talking about the— In the pre—the pre— How is the school deliberately indifferent? The school is deliberately indifferent in failing to acknowledge and put together the problems that this would cause, failing to notice. What you're pointing to is only a fear of a potential future problem. That's what you're hanging your hat on today. Well, that's all the evidence that we had at that point in time. So— But the improper curtailment of discovery was a critical error by the Court that affected the ability of Ms. Thomas to make the claim— to make the deliberate indifferent claim, because to show deliberate indifference, of course, you have to show that they acted unreasonably in light of the known circumstances. So you had to get past 12b-6 to have summary judgment for purposes of your summary— I'm sorry, to have discovery for purposes of your summary judgment motion. I'm sorry, for purposes of the summary judgment motion. Right, and we did with regard to the actions of the district in response to the report. We survived 12b-6 on that, in large part due to the OCR report and other things the Court noted. But then when we were seeking discovery for those remaining claims, the Court said, you are not permitted to get discovery on the discussion of, implementation of, or impact of the protocol. Well, so the Court left all of that evidence out. Now, that violates Ackridge and Oppenheimer and the other precedent, which says that plaintiffs are to get a wide net in terms of evidence to receive. But those cases rely on an earlier version of Rule 26. Rule 26 has since been amended and no longer includes the phrase you're relying on. It now requires that discovery be relevant to any party's claim or defense.  How are the information that you're seeking relevant to your claim about the— why do you need to know about what went into the development of the policy? Well, it wasn't just the development of the policy that the Court forbade. It was also its implementation and its effect. None of those could be considered. And those are relevant to—our question is, did the district— Related to what claim? Whether the district was deliberately indifferent in its response to Mrs. Thomas' report. So in response to the incident. In response to the incident. Not in response to the implementation of the policy. Right, in response. And so not permitting us to get any information regarding that policy impermissibly curtailed our ability to get the information to prove deliberate indifference or to establish a tribal issue of fact of deliberate indifference. Because that issue, the policy, was a known circumstance when they began their response. How did that policy affect the way they responded? We were not permitted to discover that information. You weren't permitted to discover information about the response. Response, yes. But not about how did the fact that they had instituted this policy that permitted intermingling of the sexes affect the response that they made. And the OCR report, of course, they went into detail about the relevancy of that from their standpoint on their finding of deliberate indifference. That it was very impactful for that. What information do you think you could have received about how the policy affected the response? What information do you think you were deprived of? Well, of course, not being able to get the information, obviously. I understand that, but you need to explain to us how the discovery pertained to the claims that remained in the case. It was germane to the question of when Mrs. Thomas came and made the report and then from that point forward they took whatever actions they took, the fact that they knew, all the staff at the school knew, that this policy was in force and that boys could go into the girls' restroom without question. So now a boy went into the girls' restroom without question and there's an allegation that he assaulted her in that restroom. So their knowledge, okay, how are we going to respond to this? How much was that affected by the fact that their own directive or protocol... I'm sorry. If they didn't properly respond, it doesn't matter why. And if they did properly respond, it doesn't matter if that was in spite of some other something they should have done in the past, does it? Don't we just judge the response itself? Well, yes, you judge the response itself and, of course, it's our position that it was wholly inadequate, which is also what... Okay, you either win or lose on that. If you win, then we don't need to be talking about why. And if you lose, we don't need to be talking why it was good, do we? Well, we do in the fact of, especially with the way the district court ruled on the summary judgment motion, the fact that we didn't have all of the information and the standard is did they act reasonably in light of all of the known circumstances? We could not inquire about all the known circumstances. So how could we... Hypothesize for me. Make up the best unknown circumstance you can hypothesize that you might have discovered on the best day of your discovery life that would have changed the result of what they actually did. That they were aware that there was this policy in place and they had been warned that this would happen. When this happened now, they all... They said, oh, my goodness. This is what we were warned about. This has happened. We need to try to cover this up. We need to try to discredit the mother who made the report. We need to not answer her inquiries. We need to file a false DFAX report against her. We need to do all these things because we've been caught with what we were warned our policy would cause. You bring in all that in mind and background and you stumble across it. Deal with the coins they left the machine on. That doesn't change the objective reasonableness of the response, does it? I mean, if they'd said all that and they had rushed out there and did everything you could hope for school to do with this situation after the incident, whatever they said in the background, whatever they planned, doesn't matter, does it? Isn't it what they actually did? I mean, that's what impacts the mother and the child.  And, of course, what they actually did was woefully inadequate. You either win or lose on that. Yes. The information that you're discussing right now that you would have found in the best discovery day of your life, wouldn't that, related to the response, wouldn't it have been discoverable otherwise? Because you have asked what you're talking about, at least to my understanding, the discovery that the district court didn't allow was information leading to what caused the school district to get to the policy, sort of the precursor to the policy. You're now . . . What you just described seems to fall into the response bucket and that would have . . . If they're over there going, oh my gosh, this is so awful, I wish we had heeded the parents' warning, that would have been in the response bucket and you would have been entitled to that. We weren't entitled to that under the court's order. During depositions, we would present the policy to the superintendent, to the principal over objections and the only thing we could do is say, yes, this was what we established. We were not, under the court's order, permitted to ask the superintendent, the principal, how did this . . . Did this have any effect on your response? What did you do in response? I have to go back to Judge Carter's question. What you've described as what you might be able to find and you were not able to is part of the response. Yes. You're saying, tell me all that you did in the response, tell me all the discussions you had. Yes. I don't think that's the request. The discovery request that the district court prohibited you from. That's my interpretation. I can't speak for the rest of the panel. That's the interpretation that was implemented by defense counsel and we agreed that it was too wide but that's how discovery went. We were not able to inquire into those. Do you agree that this discovery request that you're arguing about now was too broad? I'm saying that the court's . . . Yes. The court's prohibition on discovery . . . You just said the prohibition was too broad. Yes, the prohibition was too broad. Do you agree? Yes. Okay. We do. We did. Thank you. My time is up. Good morning. May it please the court. My name is Carrie Ware and along with my colleague, Ms. Jill Young, we represent the appellee's defendants in this case. I'm going to be arguing the issue of the grant of summary judgment on Title IX and Title VI and Ms. Young is going to address the motion to dismiss issue and the discovery issue. As this court has already recognized this morning that the standard in order to establish the Title IX claim in this case, one of the elements is deliberate indifference. That is an extremely high bar. In fact, in the Adams case, the Adams v. Demopolis City Schools case, it was described as, you must know of and disregard an excessive and extremely great risk to the victim's health or safety. There is an overwhelming body of case law from this circuit that discusses deliberate indifference and the actions of school systems in that context. Do you agree that if the school district had adopted or implemented the policy and had known actual sexual assaults that had occurred when the different sexes were combined at the school, that that might violate... Would you agree that if you implemented the policy in spite of known sexual assaults, that that would violate Title IX? That a jury could find that, depending on the previous assaults, but had there been sexual assaults in the bathroom over a period of time that the school was aware of, that could potentially violate Title IX because that would put the district on notice. But there were no known sexual assaults in this case, correct? Correct. Before the incident? That is correct. So as I understand it, the Title IX claim relating to the implementation of the policy was based on parents' concerns that bad things might happen. Correct. At a public meeting, during public comment, parents expressed some generalized concerns about safety and privacy. There were no specifics given, and there are no specifics in the record. And in fact, OCR apparently, according to the report the plaintiffs are relying upon, interviewed some of those parents and specifically stated in their report those parents could offer no specific incidents. So there's nothing in the record about any prior incidents. If you look at what the school did in this case, actually did, you see that it falls well within the body of law in which this circuit has said it's not deliberately indifferent. So let's look at what that was. Because there's been a narrative throughout this case that the school did nothing or didn't investigate. So now we're talking about the difference to the incident. We are now talking about the response to the incident, yes. The school immediately contacted the police on the day the report was made and began its own investigation. The principal, Ms. Fowler, and Mr. Roden, who was the executive director of student services at the central office, separately interviewed witnesses that day, including the classroom teacher, the paraprofessional, the school nurse. They obtained separately written statements from other witnesses, the counselor, the instructional coach, and the nurse who actually took the report from Mom, Ms. Thomas. They did not interview the two 5-year-old children out of a concern and their training that they were not forensically trained to interview children about sexual assault allegations. That has been an issue in this case, but that was a decision made because of the young age of the children. But... At least one question, I think, was asked of the accusing student. The nurse did ask her... She pulled her from class and said, could you show me where this occurred? And she indicated it was the bathroom across the hall from the office. Yes. But that was not really an interview. It was just, we need to figure out where this occurred so we can figure out how it happened. The school then went on to... They did refer both children to DFACS. And I want to address that point because there has been a narrative also created throughout this case that there was a false DFACS report made against Ms. Thomas. There were DFACS reports made against both children. Not against, but about. Both reports indicated that the little boy was the alleged perpetrator. There is nothing in the DFACS report about the little girl that suggests that mom is not a fit mother or that she did anything wrong. The face of the DFACS reports themselves will reflect that and I encourage you to read them. They are in the record. They are attached to the depositions of the social workers. In addition to contacting DFACS to try to get the student services, because DFACS can get a forensic interviewer, they then followed up with DFACS. On several occasions, they were able to confirm there was a forensic trauma interview scheduled for the little girl. At some point, DFACS stops returning phone calls because... The report of the incident did trigger your mandatory reporting. Yes, yes. And that was the position of the school, that they had an obligation under the law to report because it's two children under the age of 14. The school ensured that mom took the little girl to the hospital to get examined that day for medical care, and then Mr. Rodin from central office directed Ms. Dickerson, who was the homeless list liaison, please follow up and make sure she took the daughter to get medical care, and she said she did that. She testified she did that. And then the following week, this was on a Friday, the report was made, the following week was Thanksgiving break. Mom did not return the child to school after Thanksgiving break. The school did not have indication that she wasn't going to, but when she did not, the social workers began making efforts to communicate with mom. Ultimately went to the house, left a note for mom to please bring the kids back to school. They met with mom when she brought the daughters back to school, immediately transferred the little girl to a new kindergarten classroom where there was a private bathroom. And that was, even though at that point the school still had not confirmed that this incident occurred, they could not corroborate it occurred, but they still treated her with regard to safety concerns as if it had. Additionally, the school also put in place monitoring of the boy, additional monitoring of the little boy, and he was required to have an escort to go to the bathroom. I think Mrs. Thomas' key allegations on the deliberate indifference to the incident seems to be focused on the fact that she couldn't get a response from the school about the status of the investigation or what remedies would be available, and that seems to track with the OCR finding of a Title IX violation based on that same omission. How do you respond to that as far as how it ties into the deliberate indifference claim? So OCR's finding was not under the deliberate indifference standard, and I would submit that the facts that OCR found in their report, if you accept all of them as true, still do not establish deliberate indifference, and there is disputed testimony about whether Mom was making calls. The school says it was trying to contact her. She says she was trying to contact the school. Both of those things can be true at the same time, but ultimately that's not material because the social workers went out, left a note, were able to get Mom to bring the daughter back to school, and the school acted to put safety measures in place and ensure she could come back and be safe. So we're looking at what the district did. If you accept the plaintiff's version, which you're required to do in a de novo review, that the school did not call her back, that still doesn't rise to the level of deliberate indifference in light of all of the other actions the school took. Could it be poor customer service? For sure, but that doesn't make it deliberate indifference. Yes? I noticed something that doesn't seem consistent with some of the things you said, but maybe it is, but it seems contradictory. I understand that Principal Fowler met separately, good for him, with Jane's and John's kindergarten teacher and paraprofessional, right? She interviewed them, yes. And they both reported to her that they didn't allow John Doe to go to the bathroom by himself. That's correct. Then how did this happen? Well, the school was never able to corroborate that it actually did occur because in doing these interviews, what they learned is that John was not allowed to go to the bathroom by himself. They could not recall ever allowing him to go to the bathroom at the same time as the little girl. So the school, in doing their investigation, was not able to corroborate it. Well, there's two possibilities, of course. One is that the little girl was not telling the truth, and the other is that one of those two is not telling the truth. I mean, you got busy. Riding herd on this many kids of this age is difficult, and he could have very easily slipped off and gone to the bathroom. So assuming that that is true, Your Honor, the district still responded appropriately by putting in place measures to protect the girl. I just wondered. Her argument is, among other things about the policy, is they didn't put in place adequate protections given the cross-sexual nature of the permission granted. And the response to that isn't about what happened later necessarily. It's how this is an example of why that policy is bad. if you don't have protections. Well, Judge Cohen, that was part of his ruling, that that goes to the wisdom of the policy. Was it ill-advised? But without actual notice that there were other incidents or things going on in the bathroom that would have put the district on notice or given the district actual knowledge, that's not deliberate indifference. Our rule of review is de novo, and I get your point. That's your argument. Yes. Please ask for more time from the district courts. Yes. And I see that my time is up, and I'm going to let Ms. Young argue the other issues. But we would ask that this court determine that summary judgment onto the Title IX and Title VI claims was appropriate.  May it please the Court, my name is Jill Young, arguing on behalf of the defendants at police. This court should affirm the trial court's ruling that plaintiff's first submitted complaint failed to state a claim under Title IX that based on CSD's implementation of a bathroom protocol, CSD was deliberately indifferent to sexual harassment prior to plaintiff's report of an assault. This court should also find that the trial court did not abuse its discretion by ruling that discovery as to the discussion, implementation, or impact of CSD's restroom protocol would not be permitted. In regards to the dismissal issue, to hold that plaintiff sufficiently alleged a pre-assault Title IX deliberate indifference claim would require this court to depart from long-standing precedent from the Supreme Court and the Eleventh Circuit. As we know, a school district may only be held liable for student-on-student harassment where it has actual knowledge of sexual harassment within the district. While a claim of actual knowledge may include allegations the district had actual notice of prior harassment or the plaintiff, or of prior similar incidents that involved different victims and perpetrators, plaintiff does not allege similar prior incidents. Plaintiff does not allege any prior sexual assaults in the bathroom at Oakhurst, in CSD, or in any other school district for that matter. In fact, plaintiff's complaint does not contain any allegations of any prior sexual harassment or assault at all. Plaintiff's sole allegation supporting her claim that CSD had actual notice of sexual harassment prior to the reported assault in this case is that certain members of the Decatur community showed up at public comment at a board meeting and sent communications to the superintendent disagreeing with and disapproving of the policy because of specific concerns they had. What plaintiff is advocating for is akin to a should-have-known standard, which would be a negligence-level standard. This is not the standard of the Supreme Court or the Eleventh Circuit for Title IX. Plaintiff must also show a causal nexus between the policy and the assault. In this case, plaintiff attached to her first amendment complaint and said all portions of the OCR report are incorporated herein. Therefore, we have to look at the OCR report as containing allegations. Now, if we turn to page 4 of the OCR report, OCR states the parent, being Ms. Thomas, reported that the student said the male student, who is the perpetrator in this case, was in the girls' bathroom because the boys' bathroom was not working. Plaintiff herself told OCR that the boy was in the girls' bathroom rather than the boys' bathroom because it was not working, not because he was transgender, not because he was in there because of the transgender policy. Even in the first amendment complaint, plaintiff doesn't allege that the boy was, in fact, in the bathroom because of the policy. She alleges that the policy would allow him to be in that restroom. That was an allegation from the father of the boy, yes, and I believe that's in the OCR report. So there is some conflict, but significant that the plaintiff herself did not allege in her interview with OCR that he was in the bathroom because of the policy. Correct, but she said her daughter said he was in there because the bathroom was messed up and she saw a sign that said the bathroom was out of order. The little girl said that according to the OCR report. If he was allowed to use the girls' restroom and it just so happened the boys' restroom was out of order, that doesn't prove your point. There's also no record evidence, quite frankly, in this case that the boy was transgender. The record evidence establishes that all of the people who actually worked with the child every day said he identified as a boy and consistently used the boys' bathroom, and that's also in the OCR report, which is attached to the first submitted complaint. In regards to the discovery issue, the Supreme Court has held it's proper to deny discovery of a matter that's relevant only to claims or defenses that have been stricken. That's in the Oppenheimer case. The District Court prohibiting discovery on matters that were already dismissed is therefore proper. After the Court entered the discovery in this case, the plaintiff did not file a motion to compel any particular interrogatories, documents, or deposition testimony, and here today has not identified any particular discovery. She was denied. I see my time has expired, so in closing, this Court shall affirm the District Court's rulings in the orders granting defendant's motion to dismiss and in the scheduling order. Thank you. Your Honor, there's a few points. Did you file a motion to compel? No, Your Honor. We didn't ask any questions that could be compelled regarding the policy because we realized it would have been futile. But you didn't ever file a motion to compel?   You didn't file a motion to compel this discovery and then bring it to the District Court's attention that you wanted these documents. How did you get that before the District Court? We did not ask for documents that we knew were outside of the purview of what the Court had ordered because we knew it would be a futile act because the Court had made clear it was not going to permit. So there wasn't anything to compel discovery on because we asked questions about it during depositions, but again it was very limited because it would have been futile to do anything further because even the few questions we asked were objected to as improper under the Court's order. So the deliberate indifference question was not fully answered by defense counsel and it's much more than what they did. As an OCR report pointed out, there was evidence that they did actions the first day. When Mrs. Thomas reported it, they talked to people, they had the police department come out, made a report, the court department said we're not going to press charges, they filed the de facto reports, etc. But as the OCR report says, after that time they did nothing to investigate. Do you agree with, I think, most everybody, that the first day actions were proper, adequate, could be taught in a seminar, but thereafter is where they dropped the ball? Correct, as the OCR found, because even when the police department said we're not going to press charges, de facts didn't substantiate the allegations. As OCR pointed out, they then were obligated to pick up the ball and determine whether this happened. And a glaring absence of evidence here is that there was any investigation done by Mr. Rodin. There's no written report, there's no file, there's no notes, and Mr. Rodin passed away in 2018, so we could not obviously depose him. And the only evidence that Mr. Rodin did a thorough investigation was Dr. Doody's statement in his deposition saying, I asked him to do the investigation, he was a good administrator, so therefore I say he did a thorough investigation and he rightly concluded it didn't happen. That's not evidence. That's all there is. So there's no evidence that there was an investigation done after the first day. My time is up. Thank you, Your Honors. Ms. Howard, will you stay at the podium for a few minutes? I believe Judge Carnes has some questions unrelated to the merits of your case. Oh, certainly. Thank you. I want to discuss some things with you. Yes, sir. I want to give you an opportunity today, if you wish to do so, to speak to them, and promise you I'll give you an opportunity in writing to speak to it, if you wish to do so. Yes, sir. And it's about some concerns I have about the language and rhetoric in your briefs. I want to tell you I don't have concerns about your arguments here today. I thought they were professional. I thought they didn't cast aspersions on the judge or anything of that nature. I want to also be fair with you up front, and this is . . . I'm not purporting to verbally censure you or anything like that. I don't even know if I'd have a basis clearly to do about it because I haven't heard your response. I've always thought that . . . I've seen judges just excoriate lawyers in opinions for something in their briefs, and I've always thought that was very unfair because they don't give them a chance to explain. And I've seen situations which were questionable but explained. But here's the deal. Our rules adopt the ABA rules of professional conduct, as do, I think . . . I believe you're admitted in three states. Yes, sir. All three of your states, Virginia, Florida, and California adopt them as well. Yes. And one of them says that an attorney should not make a statement that the lawyer knows to be false or with reckless disregard as to the truth or falsity concerning the integrity of a judge. And I have a hard time squaring that with some of the statements in the brief, particularly since we have decisions that . . . where the attorney in a brief accused the judge of skewing the facts, among other things. Jacobs in Florida 23, they suspended an attorney from practice for 91 days based on statements in the motion impugning the integrity of the court, including the statement . . . You've got to hand it to this attorney either for recklessness or guts. Quote, this court's insistence on ignoring established Florida Supreme Court law to benefit bad corporate citizens is certain to cause chaos, end of quote. But that's a question. That's a statement example impugning the integrity of the court. And, of course, here we're talking about the district court. And then in Patterson 2018, an attorney had violated the state's rule where the attorney had contended in an appellate filing that law is whatever the judge or judges that day say it is. And finally, this is the last one, I believe. Well, no, it's not. Norkin, Florida 2013, made disparaging remarks about two judges, including one of the judges was at opposing counsel Beck and Call that violated the rule. And then there was a California 1973 decision. This court obviously doesn't want to apply the law. They upheld a contempt order when the attorney made that statement to the trial court. Here's the . . . here's . . . I'd like . . . if you want to comment on it today, but eventually you can respond in writing or both. The statements that bothered me in your brief are the statements that don't challenge, attack, or zealously advocate against reasoning or persuasiveness of the order, but go to the personality or personal attacks on the judge, or could be construed that in what he did and his motivation. Page 36, and I'll provide you with a copy of this and the notice on the written deal. The district court cherry-picked facts that supported defendants' version of the circumstances, disregarded significant evidentiary gaps, and disregarded contradictory evidence that created genuine issues of fact. 29 and 30, going back, the district court's conclusion that Ms. Thomas could not establish the defendants were deliberately indifferent to her report of a sexual assault was not only disingenuous, but also built upon flawed procedural and substantive premises demonstrating more of a predetermined outcome than objective analysis. As was true with its earlier dismissal of the restroom protocol issue and granting of summary judgment to defendants, the district court exceeded its authority by refusing to consider and misrepresenting relevant evidence. Now, in my mind, and I think in the dictionary sense, disingenuous is dishonest, not speaking the truth, insincere, or at least that's one interpretation of it. And mischaracterization means to characterize in a misleading manner. Misrepresent means to give a false or misleading account, or at least that's one interpretation of it. Page 32, the district court's conclusion that undisputed evidence shows an investigation was conducted wholly ignores the absence of credible evidence regarding the purported investigation. Ignore, of course, means to disregard intentionally or refuse to take notice of. 36, again, the district court cherry-picked facts, etc. The district court's selective recitation of evidence, with all reasonable inferences drawn in the defendant's favor. 39, the district court further attempted to buttress its conclusion by misrepresenting and trivializing Ms. Thomas' evidence. Same page, its mischaracterization of Ms. Thomas' argument. And then again on the same page, the district court's dismissive mischaracterization of Ms. Thomas' claims. And then page 44, the district court trivialized and rejected outright Ms. Thomas' argument about a certain thing. And then the district court on page 45 of not giving serious consideration to the claims, but rather a cavalier brush-off as immaterial. Page 50, the district court dismissively disregarded these findings. The district court wholly ignored evidence. And then in the reply brief, bear with me. The district court erred in granting the motion for summary judgment, which it could only do by disregarding case-specific findings from the EOR, the Education Office of Civil Rights, and so forth, and selectively citing evidence favoring the district of the defendant's position. Page 7, the only way the defendants in district court could reach a conclusion is by citing only those facts that fit their narrative, and ignoring, trivializing, or dismissing as immaterial facts that created a genuine dispute. It criticized the district court's selective paraphrase. And then page 15, finally, you say the district court selectively restated the factual record. That, if that doesn't go to the district court's integrity, I don't know what does. I mean, if you accuse the district court of cavalierly brushing off, dismissing in a careless or dismissive manner, or ignoring to disregard intentionally, or misrepresenting to give a false or misleading account, to mischaracterize means to characterize in a misleading manner, and disingenuous, dishonest, not speaking the truth, insincere. And here's the puzzle. It's de novo review. You didn't have to go after the district court, and you should never do it unless you're filing a disciplinary complaint against the court for something that's extraordinary, or wrong, or so forth. We all make mistakes. And if the district court made some, it wasn't because the district court lacked integrity or was deliberately misrepresenting things, and so forth and so on. And that's my concern. It's not a finding. It's just what I would like you to respond to before I decide whether I can refer this, or should refer this, to the chief judge for reference to a disciplinary committee. Well, certainly, Your Honor, that was not the intent of the arguments made. The intent was to show that the decisions made by the court were not proper, were not well-founded, and that there were errors made in the court's decision. It was not an intent to impugn the court itself. It was being zealous about showing how there was an absence of evidence to support certain statements, that there was a very deep disagreement on facts, but the deeply disagreeing facts were not put into the court's decision. So the court's decisions were in error, and it was our intent, as zealous advocates, to try to point out that, from our perspective, these were serious errors in the decision made by the court. We have no reason to or desire to impugn Judge Cohen. We are just saying that the decisions that he made and the analysis that was presented from our perspective were not proper and were in error. This is a question, but you can say the decision doesn't grapple with. The decision states this fact, but the evidence shows this, that, and the other. But you didn't talk about the decision so much as you talked about the judge being dishonest, not speaking the truth, and being insincere. That's what disingenuous means. He characterized it in a misleading manner. You said the district court, not the decision. There are ways to do this, and you're an experienced advocate. No question about that. I can't believe that you make these kind of arguments about lower courts who ruled against you in every case you've been in. Maybe you do, but I'm telling you, it concerns me. You'll have time to set it out in writing, and I just want to tell you, my concern goes beyond the decision did this, that, and the other. We all have, I have, said the problem with this decision is it doesn't grapple with this. It doesn't recognize this, and it was never pointed out that. But it contradicts this. And on de novo review, if it was a discretionary decision, you've got to say the district court abused its discretion. But that doesn't mean the district court mischaracterized the facts in reaching it. But we don't have any abuse of discretion stuff here. That may be the discovery, but that's not where the language appears. Now, I don't want to cut you off, but we can. And again, this isn't me finding you violated in any of these cases. I'm just wanting to make sure that you know my concern, and you have a full and fair opportunity to respond to it. And to the extent it goes to the substance of the merits or anything, the court as a whole, this is me, but the court as a whole will decide whether you need to respond to anything about that. I don't know that it will, and I don't know that even if it does, you'll need to respond. But any questions, anything else you'd like to say? I don't want to cut you off. No, Your Honor. I appreciate you expressing the concern. And like I say, it certainly was not the intent to cross the line. It was merely zealous advocacy to point out what we believed were gross errors in the judge's decision. My partner, Mrs. Broyles, would like to answer this as well. Go ahead. If that's okay. I understand, Your Honor. I do believe my name is on there in some respect. I first of all want to say that to the extent that it gave the impression of a personal attack to the judge, I apologize. I apologize. I do want to give this explanation. There was grave concern on our part that there were whole bodies of evidence that were not apparently even looked at. They were very significant. The report of our expert on defects that explained how there was no mandate to report the victim, et cetera. No, what I'm trying to explicate, Your Honor, is it was difficult for us to understand and troubling the bodies of evidence that were not considered. I'm not going to argue with you, but you did a very easy job of doing a no-blow review of pointing out the evidence. Yes, and you're correct, Your Honor. You are correct. You want to rightly judge our professionalism in this. And perhaps with the apology that is warranted is also an explanation of certain things. We hadn't seen that kind of omission of significant bodies of evidence. I could go down a long list if we needed to. And what you should have done in your brief, Counsel. This decision in this order doesn't matter. Then you didn't need to say disingenuous, mischaracterized, and misrepresented. We would regret that we included any additional characterizations beyond that. So, Your Honor, I just felt that I needed to make that clear. I haven't heard a full apology. I'm not trying to get that out of you. I'm just saying I'm not about to send a lawyer to discipline without giving them an opportunity to respond. The way it works, and I'm sure you'll be interested, is a judge of this court can send something directly to a disciplinary panel. Or you can go to the chief judge. I used to get some of them when I was chief. And the chief judge then makes a decision about referring it to a panel of judges that sit all the time to be a disciplinary panel because they see things that warrant further consideration. None of that's going to happen until, and you don't need to send me anything in writing until I send you a written deal explaining my concern. It'll follow exactly here, but I always, like the old law, you're walking down the courthouse steps thanks to what he should have said. I trust my writing more than the verb. I just want to give you a heads up here. I wanted to come up here and say what I said to understand the consternation that was behind some of the writing and the language. I just hadn't seen that before in my practice. Well, I should say we. But thank you, Your Honor, for addressing that with us. Just so I understand, you were on the brief with her and you're responsible for the brief as well as she is? I believe my name is on there. I know from 17 and a half years in government, you can generally go down to the bottom. That's the person who did most of the grunt work on it. And as you go higher, you get more edits and polishing and that sort of stuff. And I know Ms. McAllister, with her experience, wouldn't turn in a brief that she didn't personally and wouldn't sign a brief she didn't personally read. That sort of thing. We're past that. OK. Thank you, Your Honor. Sorry to take all that time, but I wanted to make it clear. Court is adjourned.